IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

**VICTOR BISHAY**
110 Scarborough Road
Toronto, Ontario M4E 3M5
Canada

        **Petitioner,**

v.

**NICOLE MARIE BISHAY**
3422 Snow Glen Lane
Lansing, Michigan 48917

and

**MARY KAY CLIFFORD**
3422 Snow Glen Lane
Lansing, Michigan 48917

        **Respondents.**

Case No.

### VERIFIED PETITION FOR RETURN OF CHILDREN TO CANADA AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001** *et seq.*

## I.    INTRODUCTION

1. Petitioner, Victor Bishay ("Father"), by and through his undersigned counsel files this Verified Petition for Return of Children to Canada (the "Petition") against Respondent, Nicole Marie Bishay ("Mother") and Respondent, Mary Kay Clifford ("Maternal Grandmother") (collectively "Respondents").

2. This Petition is filed as a result of Respondents' wrongful retention of the parties' children, A.A.V.B., born in 2011, K.L.B., born in 2015, and M.K.B., born in 2015, in the United States from the proper custody and habitual residence jurisdiction of Canada.

1

3. The wrongful retention occurred on or about November 25, 2024.

4. This Petition is brought pursuant to The Convention of the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

5. The Convention came into force in the United States of America on July 1, 1988, and was ratified between the United States of America and Canada, on the same date.[3]

6. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## II.    JURISDICTION

7. This Court has jurisdiction under ICARA § 9003 because this case involves the wrongful retention of three children under the age of sixteen from the children's habitual residence of Canada.

8. The children are currently located within the jurisdiction of this Court in the Western District of Michigan at the Maternal Grandmother's home.

9. Pursuant to ICARA, federal courts have concurrent original jurisdiction for Hague Convention actions. State court custody actions may not trump clearly granted federal court jurisdiction to decide actions arising under the Hague Convention.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed December 4, 2024).
[2] 22 U.S.C. 9001 *et seq*. (2015).
[3] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last accessed December 4, 2024).

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

### III.     FACTS

10. Mother and Father were married in a civil ceremony in 2008 in Cairo, Egypt.

11. Father is a dual citizen of Canada and Egypt.

12. Mother is a citizen of the United States and acquired permanent residence status in Canada in 2021.

13. Mother and Father are the parents of three children, A.A.V.B., K.L.B., and M.K.B. (the "children"). The children are under the age of sixteen.

14. The children are dual citizens of Canada and the United States.

15. Canada is the children's habitual residence.

16. The children are fully involved and immersed in day-to-day family life, cultural life, and education in Canada. The totality of the children's lives is in Canada.

17. The children's habitual residence is Ontario, Canada, including but not limited to the following ways:

    a. The children have Canadian citizenship and hold Canadian passports.

    b. The children have a family home in Canada.

    c. The parties own a family home in Toronto, Ontario, which was purchased in 2020 during the marriage.

    d. The family lived together in their family home in Toronto, Ontario from June 15, 2020 until July 1, 2023 when they temporarily traveled abroad for Mother's employment.

    e. The children shared time with both parents in Canada.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

    f. The children received medical care in Canada through Canada's comprehensive national healthcare system and have healthcare cards issued by the Ontario Health Insurance Plan (OHIP) as residents of Canada.

    g. The children have their pediatrician, dentists, obtain immunizations, and attend medical appointments in Canada.

    h. The children attend schools in Canada.

    i. M.K.B. received an Individual Education Plan (IEP), designed for him in Ontario to assist him with his education.

    j. The children attend extracurricular activities in Canada, including camps during the summer of 2024.

    k. The children have immediate and extended family in Canada.

    l. The children have friends in Canada.

18. The parties met in Cairo, Egypt in 2004.

19. They began living together in Dubai in 2006 and remained there until 2015. They traveled to Egypt for a civil marriage ceremony in 2008 and a religious ceremony in January 2009.

20. In 2011, Mother traveled temporarily to Michigan to give birth to A.A.V.B. After six weeks of recovery, Mother and A.A.V.B. returned to Dubai, UAE.

21. In 2015, the parties and A.A.V.B. moved to Luxembourg for Father's employment with Amazon.

22. K.L.B. and M.K.B., who are twins, were born in Luxembourg.

23. At the conclusion of Father's two-year assignment, the parties and the children moved from Luxembourg to Dubai in 2017 and lived there until 2020.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

24. In March 2020, the parties and the children permanently moved to Toronto, Ontario, Canada.

25. In April 2020, Father obtained employment as a technology executive for Commvault Systems. Father's employment was based in Toronto, Canada such that he received his pay in Canadian dollars and paid income taxes in Canada.

26. In June 2020, Mother applied for permanent residence status in Canada.

27. The parties purchased a family home in Toronto in June 2020. The parties selected their family home based upon the family plan to permanently live in Canada.

28. The parties enrolled their children into school in Canada close to the family home.

29. A.A.V.B. attended Balmy Beach Community School for the 2020-2021, 2021-2022, and 2022-2023 school years.

30. K.L.B. and M.K.B. attended Balmy Beach Community School for the 2020-2021, 2021-2022, and 2022-2023 school years.

31. In early 2023, while the family lived in Canada, Mother applied for and obtained a position as a Foreign Service Officer for the United States Department of State.

32. As a result of Mother's new employment, the parties agreed to temporarily reside abroad for Mother's two-year posting in Cairo, Egypt. The parties anticipated that Mother's post at the U.S. Embassy in Cairo, Egypt would occur from November 2023 until November 2025.

33. Prior to being posted in Egypt, Mother participated in mandatory training from July-October 2023 in Arlington, Virginia. The family temporarily traveled to Arlington, Virginia for Mother's training. They stayed in temporary housing funded by the U.S. government.

34. In November 2023, the family temporarily traveled to Cairo, Egypt for Mother's two-year posting.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

35. The family stayed together in housing provided by the U.S. Embassy in Cairo.

36. Father continued to work remotely for his employer.

37. The children attended school in Cairo beginning in November 2023.

38. In March 2024, Mother announced that she wanted to separate from Father. In April 2024, Mother admitted that she is having an affair with a co-worker.

39. While the parties tried to formalize their separation through mediation, the parties and the children remained in Cairo, Egypt.

40. In the interim, the parties agreed on a "nesting" arrangement for the children in Cairo, Egypt during which Father would spend one week with the children at the U.S. Embassy housing, then Mother would spend one week with the children there, and alternating weekly thereafter. Both parties had equal access to the U.S. Embassy housing.

41. During the summer 2024, Father and the children returned to Ontario, Canada while Mother remained in Cairo. The children attended camps while home in Canada.

42. Beginning in July 2024, Father periodically traveled to Dubai, UAE to be on-site for his employer and to be able to continue to be present during Mother's post in Cairo, Egypt. He stayed in hotels while visiting Dubai.

43. The parties anticipated that Mother would be notified of her next posting abroad sometime in October 2024. Mother's next posting would begin in or around October 2025 and last for two years. Mother submitted bids for her desired posting without Father's consent.

44. The parties did not agree to the children traveling with Mother to her next posting abroad.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

45. On October 8, 2024, Mother commenced custody and divorce proceedings in the state court in Ingham County, Michigan, seeking orders pertaining to parenting time and decision-making responsibility for the children as well as divorce and financial matters.

46. The children have never lived in Michigan and have no significant connection there.

47. The parties have never agreed for the children to live in Michigan.

48. Father has never lived in Michigan.

49. Father has no immigration status to live in the United States.

50. Mother has not lived in Michigan for over twenty (20) years.

51. The parties do not own any property in Michigan.

52. On November 8, 2024, Mother informed Father that she would be posted to Krakow, Poland beginning in October 2025. Mother informed Father that she intended to take the children with her to Krakow, Poland, instead of returning them home to Canada at the conclusion of her posting in Cairo, Egypt.

53. Father told Mother that he does not consent to the children traveling to Mother's next posting in Krakow, Poland.

54. On November 15, 2024, Father commenced custody proceedings in Ontario, Canada, where the children have their habitual residence, seeking orders pertaining to parenting time and decision-making responsibility for the children.

55. Also on November 15, 2024, Father filed a Motion for Summary Disposition to dismiss the Michigan court proceedings for lack of jurisdiction and improper service.

56. During November, the parties discussed the plan for the upcoming Thanksgiving holiday. Mother told Father that she desired to travel with the children to Maternal Grandmother's

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

home in Michigan for the holiday. Upon information and belief, Mother planned to thereafter travel to Ohio to visit her paramour's family and introduce the children to them.

57. Father told Mother that he does not consent to the children meeting Mother's paramour's family.

58. Mother was not happy about Father's objection to her proposed holiday plans. Father became concerned that Mother would take the children for the holiday without his consent. He therefore collected the children's U.S. passports and held them in his possession until the parties could reach an agreement on holiday travel. Father immediately told Mother that he was holding the children's passports while they sorted out their disagreement. Father also informed the Regional Security Officer at the U.S. Embassy that he had possession of the passports and asked if he needed to give them to a third party, to which he was told either parent may hold them.

59. Mother was not happy about Father holding the children's passports and claimed an urgent need to have the passports in her possession. She then involved her superiors at the U.S. Embassy in Cairo to speak to Father.

60. On November 18, 2024, Mother removed the children from the U.S. Embassy housing in Cairo and hid them from Father.

61. On November 19, 2024, Father met with Mother's superiors at the U.S. Embassy in Cairo per their request. They informed Father that Mother and the children were in Cairo, but that Mother's post had been curtailed and she was required to leave Cairo, where she and the children were diplomats, immediately.

62. The U.S. Embassy informed Father that Mother and the children would be traveling on a flight to Washington, DC where the U.S. Department of State is based.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

63. Father advised the superiors at the U.S. Embassy that the children do not live in Washington, DC and he does not consent to them traveling to the United States. Father had previously told Mother he does not consent to her taking the children to the United States.

64. On November 19, 2024, after Mother hid the children for two days, the U.S. Embassy arranged for a two-hour visit between Father and the children at the U.S. Embassy housing in Cairo.

65. At the U.S. Embassy's insistence, Father immediately surrendered the children's U.S. passports. Upon information and belief, at Mother's request, the U.S. government issued the children one-day passports to depart Cairo, Egypt.

66. On November 20, 2024, without Father's consent, Mother took the children on a flight from Cairo, Egypt to the Washington, DC area.

67. Upon information and belief, from November 20, 2024 until November 23, 2024, Mother and the children temporarily stayed at Mother's friend's home in Arlington, Virginia.

68. During these four days, Mother refused to disclose the children's location to Father.

69. On November 22, 2024, while Mother was hiding the children in Virginia, Mother filed an "Emergency Ex Parte Motion for Temporary Injunctive Relief Under the Uniform Child Abduction Prevention Act" in the Michigan state court. Mother alleged that Father was a flight risk and threatened to remove the children to Dubai.

70. Father never threatened to take the children to Dubai. The children do not live in Dubai. Prior to Mother's manufactured claims of abduction, the parties had expressly discussed in text messages a four-day holiday trip for Father and the children to visit Sea World, which recently opened in the UAE. Mother agreed to the holiday trip, which was planned for the Thanksgiving holiday week.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

71. The Michigan state court denied Mother's Ex Parte Motion because the children were not physically present in Michigan.

72. Upon information and belief, on or about November 23, 2024, Mother and the children traveled from Virginia to Michigan to the Maternal Grandmother's home.

73. On November 25, 2024, Mother filed the same "Emergency Ex Parte Motion for Temporary Injunctive Relief Under the Uniform Child Abduction Prevention Act" again in the Michigan state court, but this time alleging that the children were physically present in Michigan.

74. Mother provided piecemeal text messages to the state court and failed to disclose material information about the parties' complete communications.

75. She alleged—while the children were exclusively with her in the United States without Father's consent—that Father was the flight risk. She did not attach a single written communication between Mother and Father. Instead, she attached selective text messages that she separately had (without Father) with the children's nanny in Egypt. These messages, which occurred after Mother left Egypt, discussed the plan for the nanny to return to her home in Dubai considering Mother's abrupt departure from Egypt. The messages did not concern the children traveling to Dubai.

76. The Michigan state court granted Mother's Ex Parte Motion based on Mother's *ex parte* and unsupported allegations and a finding of temporary, emergency jurisdiction. The court entered an Order prohibiting the children from being removed from the State of Michigan. The Michigan state court noted in its order that custody jurisdiction is challenged, and a hearing is pending for December 13, 2024.

77. On November 25, 2024, Father returned home to Ontario, Canada.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

78. On November 26, 2024, Father told Mother he does not consent to the children being retained in Michigan or Virginia. He asked for Mother's cooperation to coordinate the children's return home to Canada.

79. Mother has refused to return the children home to Canada.

80. Respondents are retaining the children at Maternal Grandmother's home in Michigan in breach of Father's rights of custody under Ontario law as explained *infra* in Count I.

### IV.    COUNT I – WRONGFUL RETENTION

81. Father restates and re-alleges the allegations contained in Paragraphs 1 though 80 as if fully set forth herein.

82. The Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

83. The children in this case are under the age of 16.

84. The children's habitual residence is Canada and was Canada on the date Respondents retained the children in the United States.

85. Based upon the totality of the circumstances, as of the date of Respondents' retention of the children on or about November 25, 2024, Canada was and is the children's home and habitual residence.

86. Since the family moved to Canada in 2020, the parties never agreed that the children's habitual residence would be anywhere other than Canada.

87. Canada is the children's ordinary home and holds a degree of settled purpose from the children's experiences and the parties' perspective.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

88. The children are fully involved and integrated in all aspects of daily and cultural life in Canada.

89. The children wish to return home to Canada.

90. Father does not consent to the children being retained in the United States.

91. Father has not acquiesced to the children being retained in the United States.

92. The law of Canada, specifically Ontario, governs the application of law as it relates to Father's rights of custody.

93. Notice is given in this Petition that Father is relying upon foreign law. FED. R. CIV. P. 44.1.

94. At the time of Respondents' retention, Father had and continues to have Hague Convention article *5a* "rights of custody" to the children under Canadian law by operation of law under the Children's Law Reform Act (the "Act").

95. Pursuant to the section 20 of the Act, both parents are equally entitled to decision-making responsibility of the children by operation of law. Decision-making responsibility is defined in Section 18 of the Act as "responsibility for making significant decisions about a child's well-being, including with respect to, (a) health, (b) education, (c) culture, language, religion and spirituality, and (d) significant extra-curricular activities."

96. Section 20(4) of the Children's Law Reform Act further provides that if the parents separate and one of the parents live with the child "with the consent, implied consent or acquiescence of the other," the right of the other to "exercise the entitlement to decision-making responsibility with respect to the child" is suspended until a separation agreement or court order.

97. In addition, Section 20 provides: "[t]he entitlement to parenting time with respect to a child includes the right to visit with and be visited by the child, and includes the same right as

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

a parent to make inquiries and to be given information about the child's well-being, including in relation to the child's health and education."

98. No court order has been entered determining the parties' decision-making responsibilities or parenting time.

99. The rights and responsibilities of a person entitled to decision-making responsibility and parenting time under Ontario law necessarily involve the "care of the child" and is therefore a right of custody under article 5*a* of the Hague Convention.

100. The parties were married at the time of each child's birth and Father is named on each child's birth certificate.

101. Father therefore has by operation of law joint decision-making responsibility and the entitlement to parenting time for each child as defined by the Children's Law Reform Act. He has these rights by operation of law without any custody orders having been entered, and he had these rights at the time Respondents retained the children in the United States from Canada.

102. Respondents' retention of the children in the United States from Canada is therefore in breach of Father's Hague Convention article 5*a* "rights of custody" under Ontario law.

103. At the time Respondents retained the children in the United States, Father was exercising his rights of custody within the meaning of Articles 3 and 5*a* of the Convention by living with the children, caring for the children, fully participating in the children's lives, and undertaking all parental rights since each child was born.

104. Respondents' retention of the children in the United States from Canada is therefore wrongful under the Hague Convention because (i) Respondents have retained the children from their habitual residence of Canada; (ii) in breach of Father's rights of custody to the children under Canadian law; (iii) which Father was exercising at the time of the retention.

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

105. Father has promptly and to the best of his ability taken all legal steps available to him to seek the return of the children to Canada. Father is in the process of submitting his Hague Application for Return to the Ontario Central Authority.

106. The children are currently physically located within the jurisdiction of this Court in the Western District of Michigan.

### V. COUNT II – ARTICLE 18 RETURN

107. Father restates and re-alleges the averments contained in Paragraphs 1 through 106 as if fully set forth herein.

108. Father invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.[4]

109. In accordance with the Article 18 equitable return factors set forth in Justice Alito's concurring opinion in *Lozano v. Montoya Alvarez*, Father requests that this Court exercise its equitable discretion to return the children to Canada under Article 18 even if Mother establishes one of the Convention's five narrow discretionary exceptions to return under the Convention.[5]

110. The children here have an interest in returning to Canada, their country of habitual residence. Father has an interest in exercising his rights of custody in Canada.

111. The governments of Canada and the United States both have an interest in discouraging inequitable conduct and deterring international child abductions.

---

[4] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *Lozano v. Alvarez*, 134 S.Ct. 1224, 1237 (2014) (Alito, J., concurring); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[5] *See Lozano*, 134 S.Ct. at 1237 (Alito, J., concurring) (listing factors that weigh in favor of returning a child to the country of habitual residence even when a narrow discretionary exception to return is established).

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

## VI.   PROVISIONAL AND EMERGENCY REMEDIES[6]

112. Simultaneously with the filing of this Petition, Father files a Motion to Expedite and Request to Issue Show Cause Order Pursuant to Hague Convention.

113. Father requests that this Court issue a Show Cause Order forthwith ordering the appearance of Respondents before this Court on the first available date on the Court's calendar and scheduling an expedited evidentiary hearing on this Petition within six weeks of the date of filing, pursuant to the Hague Convention Articles 2 and 11, the requirement of the Supreme Court of the United States that courts use the most expeditious procedures available, ICARA, and 28 U.S.C. § 1657.

114. Father further requests that this Court's Show Cause Order include provisions: i) prohibiting the removal of the children from the jurisdiction of this Court during the pendency of this proceeding; and ii) holding the children's passports and travel documents for safekeeping by the Clerk of this Court.[7]

## VII.   UCCJEA DECLARATION

115. The details regarding the children that are required to be provided under the UCCJEA are as follows:

   A. The children have been physically located at 3422 Snow Glen Lane, Lansing, Michigan 48917, with Respondents, from on or about November 23, 2024 to present as a result of Respondents' wrongful retention of the children.

---

[6] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition."  ICARA § 9004.

[7] A Petition may also be treated as an application for a Writ of Habeas Corpus itself. *Zajaczkowski v. Zajaczkowska*, 932 F. Supp. 128, 132 (D.Md. 1996) ("[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus . . . pursuant to 28 U.S.C.A. § 2243").

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

B. Upon information and belief, the children were physically located in Arlington, Virginia with Mother, from on or about November 20, 2024 to November 23, 2024.

C. From March 2024 to November 20, 2024, the children temporarily resided with Mother and Father in a shared parenting arrangement at: 11 Road 11, Apt. 43, Maadi, Cairo, Egypt.

D. From November 2023 to March 2024, the children temporarily resided with Mother and Father at 11 Road 11, Apt. 43, Maadi, Cairo, Egypt.

E. From July 2023 to November 2023, the children temporarily resided with Mother and Father in Arlington, Virginia as a result of mandatory training for Mother's employment.

F. From June 2020 to June 2023, the children resided with Mother and Father at 110 Scarborough Road, Toronto, Ontario, M4E 3M5, in Canada.

G. From March 2020 to June 2020, the children resided with the parties at their relatives' home in Toronto until they purchased their family home in June 2020.

H. From 2018 to March 2020, the children resided with Mother and Father in Dubai, United Arab Emirates.

I. Father does not have information of any custody proceeding concerning the children pending in any other court of this or any other State, except as set forth in this Petition. Father has filed a custody case in the Superior Court of Justice, Toronto, Ontario, Canada. Mother has filed a custody and divorce case in the State of Michigan, Circuit Court for the County of Ingham, File No. 24-2728-

DM. A Motion to Dismiss hearing is set for December 13, 2024. Both custody cases shall be stayed in accordance with Article 16 of the Convention.

J. Father does not know of any person, or institution, not a party to the proceedings, which has physical custody of the children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the children.

## VIII.    ATTORNEYS' FEES AND COSTS
## PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

116. Father has incurred significant expenses as a result of the wrongful retention of the children by Respondents. Father will submit, in accordance with the Federal Rules of Civil Procedure and this Court's local rules, a copy of all attorneys' fees, expenditures and costs, according to proof, incurred as a result of Respondents' wrongful retention.

117. Father respectfully requests that this Court award all reasonable and necessary expenses, including transportation costs, and attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

## IX.    NOTICE OF HEARING

118. Pursuant to ICARA § 9003(c), Respondents will be given notice of any hearings in accordance with MCL § 722.1205.[8]

**WHEREFORE**, Petitioner, Victor Bishay, respectfully requests the following relief:

A. That this Court grant this Verified Petition for Return of Children to Canada;

---

[8] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

B. That this Court issue an Order directing the prompt return of the children to their habitual residence of Canada in accordance with Petitioner's rights of custody under Ontario law and Articles 3, 5*a* and 18 of the Convention;

C. That this Court issue a Show Cause Order in the form submitted herewith scheduling an initial scheduling hearing on the first available date on the Court's calendar;

D. That this Court's Show Cause Order be served upon Respondents forthwith by private process;

E. That all the children's passports and other travel documents be held in escrow by the Clerk of this Court during the pendency of this proceeding;

F. That the Court's Show Cause Order include provisions prohibiting the removal of the children from the jurisdiction of this Court during the pendency of this proceeding;

G. That this Court order in person access and daily electronic video access for Petitioner with the children during the pendency of this proceeding; and

H. That this Court issue an Order directing Respondents to pay Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

I. That this Court grant any such further relief as justice and Petitioner's cause may require.

## VERIFICATION

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING VERIFIED PETITION FOR RETURN IS TRUE AND CORRECT.

EXECUTED ON DECEMBER 4, 2024.

_____
Victor Bishay, *Petitioner*

Doc ID: 1e76f75f5d5d82ef1bae11540c02dbd44403d724

Respectfully submitted this 4th day of December, 2024.

/s/ Salvatore J. Vitale
Julia A. Perkins (P49042)
Salvatore J. Vitale (P75449)
Varnum LLP
39500 High Pointe Blvd, Ste 350
Novi, MI 48375
japerkins@varnumlaw.com
sjvitale@varnumlaw.com

*Counsel for Petitioner, Victor Bishay*


Leah Ramirez, DC Bar No. 1031995
MARKHAM LAW FIRM
2154 Wisconsin Avenue NW
Washington, DC 20007
(240) 858-8716
LRamirez@markhamlegal.com

*Pro Hac Vice (Motion for Admission Pending)*

19